

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF NEW YORK

**John Doe,**
 Plaintiff,

v.

**Letitia James, in her official capacity as Attorney General of New York, et al.,**
 Defendants.

Case No. **1:25-cv-1250 (BKS/ML)**

## NOTICE OF FILING EXHIBITS IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW

Plaintiff John Doe, appearing *pro se*, respectfully submits this Notice of Filing to inform the Court and all parties that the following exhibits are being filed in support of Plaintiff's pending Motion for Preliminary Injunction and Memorandum of Law:

1. **Exhibit J – *The Settlement–McGriff Paradox: Constitutional Collapse of New York's SORA and Why New York's Registry Is Constitutionally Impossible*.**

2. **Exhibit K – *Collateral Damage: The Spillover Harms of New York's Sex Offender Registration Act*.**

3. **Exhibit L – *When Supervision Meets Digital Privacy: The Limits of Warrantless Phone Searches by New York State Parole Officers*.**

These exhibits provide additional factual and constitutional support for Plaintiff's claims that the New York Sex Offender Registration Act is unconstitutional, void *ab initio*, and incapable of lawful enforcement.

Respectfully submitted,

John Doe
Dated: 9/19/25

**John Doe**
Plaintiff, pro se

# CERTIFICATE OF SERVICE

I hereby certify that on September __, 2025, I served a true and correct copy of the foregoing **Notice of Filing of Exhibit (Exhibit J)** by depositing it in the U.S. Mail, properly addressed and with first-class postage prepaid, to the following:

**Counsel for Defendants**
Office of the Attorney General of the State of New York
The Capitol
Albany, NY 12224-0341

**Respectfully submitted,**

Dated:

**John Doe**
Plaintiff, pro se



U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
SEP 1 9 2025
AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF NEW YORK

**John Doe,**
 Plaintiff,

v.

**Letitia James, in her official capacity as Attorney General of New York, et al.,**
 Defendants.

Case No. **1:25-cv-1250 (BKS/ML)**

## Exhibit J

### *The Settlement-McGriff Paradox: Constitutional Collapse of New York's SORA and Why New York's Registry Is Constitutionally Impossible*

Submitted by Plaintiff, pro se

**Exhibit content continues on reverse.**

# I. Introduction

New York's Sex Offender Registration Act ("SORA") has collapsed into what this analysis identifies as the **Settlement–McGriff Paradox**: an **empirical demonstration** that the statute is **constitutionally void** under every possible characterization and **operationally unworkable** under every conceivable enforcement regime.

Two concurrent developments render this **constitutional impossibility** undeniable and create a **legal paradox** from which SORA cannot escape:

1. **The *Doe v. Pataki* Settlement (2025)** – The State's concession that **due process hearings** are constitutionally required for **Level 2 and 3 registrants** definitively exposes that SORA cannot function as a purely **"civil" regulatory scheme**, thereby **invalidating the foundational premise** upon which its constitutionality has been defended.
2. **The 2025 McGriff Murders** – The **systematic failure** of registration enforcement to prevent foreseeable violence or ensure meaningful public safety proves SORA's **complete futility** in achieving its stated **compelling governmental interest**, rendering any constitutional burden **unjustifiable**.

These developments confirm that the **Binary Trap**, the **Litigation Trap**, and the **Constitutional Matrix** are not theoretical constructs but **operational realities** that create an **inescapable web of constitutional violations**. SORA has become a **statute that destroys itself** through its own enforcement mechanisms.

# II. The Binary Trap: Constitutional Impossibility Proven

The **Binary Trap** demonstrates that SORA **cannot constitutionally exist** under either civil or criminal characterization:

## If SORA is characterized as "civil regulatory":

The State's own settlement requiring **individualized due process hearings** for **Level 2 and 3 registrants** constitutes a **judicial admission** that SORA's effects are **sufficiently punitive** to trigger constitutional procedural protections. This admission renders the **civil characterization legally untenable** and proves the statute operates *ultra vires*—**beyond the scope of civil regulatory authority**. A truly civil scheme would require **no such hearings**.

## If SORA is characterized as punitive:

**Retroactive application** becomes a **direct, per se violation** of the **Ex Post Facto Clause**. The settlement's procedural concessions **cannot cure this fundamental constitutional defect**—they merely **confirm it**. Due process hearings for punishment imposed after the fact **compound rather than resolve** the constitutional violation.

2

This creates **constitutional impossibility**: SORA **cannot lawfully exist** in either category, as the State's own actions have **fatally undermined** the civil characterization while simultaneously proving the **punitive effects** that make retroactive application **unconstitutional**.

# III. The Litigation Trap: Enforcement Impossibility Exposed

The **McGriff case** demonstrates the second constitutional trap—that SORA **fails under both strict and lenient enforcement**:

## Under Strict Enforcement:

**Rigorous prosecution** of registration violations would necessarily reveal SORA's **punitive character**, triggering **Ex Post Facto violations** and confirming that the regulatory framework is actually a **criminal punishment system**. **Strict enforcement proves unconstitutionality**.

## Under Lenient Enforcement (as occurred):

**Failure to rigorously enforce** registration requirements—as happened with **McGriff**—proves that SORA is **arbitrary, ineffective**, and bears **no rational relationship to public safety**. The **absence of any causal connection** between registration failures and subsequent crimes demonstrates that the system serves **no legitimate governmental purpose**. **Lenient enforcement proves futility**.

**This creates enforcement impossibility**: SORA **violates constitutional principles** whether enforced strictly (**proving punishment**) or leniently (**proving arbitrariness**). **No middle ground exists** that satisfies both constitutional requirements and practical effectiveness.

3

# IV. The Constitutional Matrix: All Pathways Lead to Invalidation

The **Settlement–McGriff Paradox** illustrates the **comprehensive nature** of SORA's constitutional failure through the **Constitutional Matrix**:

| Framework | Constitutional Analysis | Practical Outcome | Legal Result |
|---|---|---|---|
| **Civil (Automatic)** | *Ultra vires* - Settlement disproves civil nature | **Ineffective - McGriff proves failure** | **VOID** |
| **Civil (Discretionary)** | **Arbitrary & unconstitutional** due process violations | **Continued ineffectiveness demonstrated** | **VOID** |
| **Punitive (Strict)** | **Direct Ex Post Facto Clause violations** | **No measurable safety improvement** | **VOID** |
| **Punitive (Lenient)** | **Admits absence of compelling governmental interest** | **Proven failure to achieve stated purpose** | **VOID** |

**Every conceivable pathway terminates in constitutional invalidity.** The matrix demonstrates that SORA's **fundamental design** creates **irreconcilable conflicts** that cannot be resolved through statutory interpretation, enforcement modification, or procedural adjustments.

# V. The Paradox Defined: Self-Destruction Through Operation

The **Settlement–McGriff Paradox** represents a **unique form of constitutional failure**: a **statute that invalidates itself through the very mechanisms designed to legitimize it**.

- **The Settlement** was intended to **cure due process deficiencies** but instead constitutes a **fatal admission of SORA's punitive nature**
- **The McGriff enforcement pattern** was designed to demonstrate **regulatory effectiveness** but instead proves **systematic failure and arbitrariness**
- **Combined effect**: Each attempt to **validate SORA's constitutionality** provides **additional evidence of its fundamental invalidity**

This creates a **legal impossibility**: SORA **cannot be constitutionally enforced**, **constitutionally reformed**, or **constitutionally abandoned** without admitting its **comprehensive failure** across all possible frameworks.

4

# VI. Conclusion: Constitutional Void Ab Initio

The **Settlement–McGriff Paradox** provides **empirical proof** that the **Binary Trap**, **Litigation Trap**, and **Constitutional Matrix** govern SORA's operation as **legal realities** rather than theoretical concerns. The statute's **constitutional collapse** is now demonstrable through the State's own admissions and enforcement failures:

1. **State Admission of Punitive Character**: The settlement requiring **due process hearings** constitutes a **binding judicial admission** that SORA operates as **punishment, not civil regulation**
2. **Empirical Proof of Public Safety Failure**: The **McGriff murders** demonstrate that SORA's purported **compelling governmental interest is illusory and unachievable**
3. **Matrix Confirmation**: **No possible constitutional framework** or enforcement regime can **cure these fundamental defects**

SORA is therefore *void ab initio*—**constitutionally null from its inception**. It represents a **statutory impossibility**: a law that **cannot exist under any constitutional framework**, **cannot be enforced under any constitutional standard**, and **cannot achieve any legitimate governmental purpose** under any operational model.

The paradox proves that SORA is **not merely unconstitutional as applied** or in specific circumstances—it is **constitutionally impossible as conceived, designed, and implemented**. The statute **self-destructs upon contact** with both legal scrutiny and practical reality, creating a **constitutional black hole** from which **no valid enforcement authority can emerge**.

# Why New York's Registry Is Constitutionally Impossible

Everyone knows something feels wrong about New York's Sex Offender Registration Act (SORA). It ruins lives, doesn't actually protect the public, and seems legally shaky. But most people — even lawyers and judges — struggle to explain *why* it's wrong.

That's where the Binary Trap, Litigation Trap, and Constitutional Matrix come in. They reveal the fatal contradictions built into the system:

## 1. The Binary Trap (Civil vs. Punitive)

- The State insists SORA is *civil*, not punishment, so it can apply retroactively.

- But courts use it at sentencing like a punishment.

- If it's civil → criminal courts had no jurisdiction to impose it.

- If it's punishment → retroactive application violates the Constitution (Ex Post Facto & Double Jeopardy).
  👉 Either way, it collapses.

## 2. The Litigation Trap (Enforcement)

- If the State enforces SORA harshly → it proves it's punishment.

- If the State enforces it lightly → it proves it has no real public safety value.

- If the State enforces it selectively (as in the McGriff case) → it proves both arbitrary enforcement *and* failure to protect.
  👉 Every enforcement path proves it unconstitutional or useless.

## 3. The Constitutional Matrix (No Safe Exit)

When you line up all the options (civil/punitive + strict/lenient enforcement), every single outcome results in either:

- A constitutional violation, or

- Proof the law doesn't work.

There is no cell in the "matrix" where SORA is both constitutional and effective.

# The Bottom Line

- **Everyone feels SORA is wrong.**

- **The traps show *why* it's wrong: the law contradicts itself no matter how you frame it.**

- **A statute that can't exist without violating the Constitution — and can't achieve its goals in practice — is void from the start (void ab initio).**

This is not just unfair policy. It's a legal impossibility the courts cannot ignore.



U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
SEP 1 9 2025
AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF NEW YORK

**John Doe,**
 Plaintiff,

v.

**Letitia James, in her official capacity as Attorney General of New York, et al.,**
 Defendants.

Case No. **1:25-cv-1250 (BKS/ML)**

## EXHIBIT K

**Collateral Damage: The Spillover Harms of New York's Sex Offender Registration Act**

Submitted by Plaintiff, pro se

**Exhibit content continues on reverse.**

# I. Introduction

The **New York Sex Offender Registration Act ("SORA")** does not confine its punishment to those convicted of crimes. Its reach extends outward, inflicting widespread **collateral damage** on innocent spouses, children, families, employers, friends, and entire communities. These **spillover harms** are not incidental but inevitable, built into the very structure of **public disclosure**, **residency bans**, **perpetual surveillance**, and invasive reporting requirements that conscript third parties into the state's monitoring apparatus. By transforming punishment into a form of **inherited stigma** and **forced complicity**, SORA imposes consequences on those who have committed no offense, eroding constitutional principles of **due process**, **equal protection**, and **human dignity**.

# II. Family Impact

SORA fractures **family unity** and inflicts direct punishment on loved ones:

**Forced Separation: Residency restrictions** often prevent families from living together if their home falls within **exclusion zones**. Parents are driven from households, spouses separated, and children deprived of stability.

**Harassment and Discrimination:** Families of registrants face ongoing threats, bullying, and **workplace retaliation** simply because of association. Children are labeled **"sex offender's kids"** and denied normal educational and social experiences.

**Inherited Punishment:** Innocent children are **punished for the crimes of their parents**, a practice inconsistent with the most basic principles of justice.

**Financial Devastation:** Families bear the burden of **registration fees**, **monitoring costs**, and the economic consequences of employment discrimination, often pushing entire households into poverty.

# III. Invasive Vehicle Registration Requirements

SORA transforms innocent third parties into **unwilling participants** in the surveillance state:

**Forced Disclosure of Family Vehicles:** Registrants must report detailed information about every vehicle owned, operated, or regularly used by family members, including **license plates**, **VIN numbers**, make, model, and color. This requirement extends the **state's surveillance apparatus** directly into the lives of spouses, children, and other household members.

**Employer Vehicle Conscription:** Registrants must disclose information about **employer-owned vehicles** they operate, effectively **forcing employers into the registration system** and potentially exposing business operations to public scrutiny.

**Friend and Associate Vehicle Tracking:** Any vehicle regularly used by a registrant—including those belonging to **friends, relatives, or associates**—must be reported to authorities. This requirement **chills social relationships** and forces innocent parties to choose between maintaining normal human connections and avoiding state surveillance.

**Public Disclosure of Third-Party Property:** Vehicle information is often included in **public registry databases**, exposing the private property details of family members, employers, and friends to public view and potential **vigilante targeting**.

# IV. Housing and Homelessness

**Residency restrictions** and registry stigma produce systemic homelessness:

**Exclusion from 85–95% of Housing:** Studies confirm that nearly all rental housing in urban and suburban areas is **off-limits to registrants**, forcing displacement.

**Registry Homelessness:** Thousands of registrants are left to sleep in cars, abandoned buildings, or public spaces. Shelters routinely refuse registrants, creating a **subclass of "registry homeless"** invisible to normal social safety nets.

**Impact on Families:** Spouses and children are uprooted, destabilized, and driven into poverty due to the **inability to secure stable housing**.

**Landlord Liability Fears:** Property owners refuse to rent to families of registrants, fearing **community backlash** and potential legal liability.

# V. Employment Devastation and Workplace Contamination

Employment opportunities vanish under SORA's **perpetual branding**, with consequences extending far beyond the registrant:

**Discrimination Rates of 60–80%:** Major employers systematically reject applicants based solely on **registry status**, regardless of rehabilitation or time elapsed.

**Employer Intimidation:** Businesses employing registrants face community pressure, **boycotts**, and harassment, forcing employers to choose between fairness and business survival.

**Workplace Vehicle Surveillance: Employer vehicle reporting requirements** create additional administrative burdens and potential liability for businesses, discouraging employment of registrants.

**Cycle of Poverty:** Families are forced into **public assistance**, **food insecurity**, and economic instability.

**Collateral Employment Harm:** Spouses and adult children may face **employment discrimination by association**, as background checks increasingly reveal family connections to registrants.

# VI. Technology and Digital Surveillance Spillovers

Modern SORA requirements extend surveillance into the **digital realm**, ensnaring family members:

**Internet Identifier Reporting:** Registrants must report all **email addresses**, **social media accounts**, and **online identifiers**, potentially exposing family communications and shared accounts.

**Shared Technology Monitoring:** Household computers, phones, and internet connections become subject to potential **monitoring and restrictions**, limiting family members' **digital privacy** and freedom.

**Social Media Contamination:** Family members' social media profiles may be **scrutinized or restricted** due to their connection to registrants, **chilling free expression** and association.

# VII. Vigilante Violence

The **public registry** creates targets for violence, endangering entire households:

**Documented Murders and Assaults:** In **2006**, two registrants in **Maine** were murdered after being located through the registry. In **2012**, a registrant in **upstate New York** was shot by a neighbor using registry information. Most recently, in **2025**, **Shawn Dawson** was murdered in **Allegheny County, NY**, demonstrating the continuing deadly consequences of public registry information.

**Arson and Harassment: Hundreds of attacks nationwide** are directly traceable to registry disclosures. Families living at the same address suffer **property destruction** and **physical danger**.

**Vehicle-Based Targeting:** Published vehicle information enables vigilantes to track and target not only registrants but anyone associated with those vehicles, including **family members, employers, and friends**.

**State-Created Risk:** By publishing identifying details including vehicle information and addresses, the State **affirmatively exposes** entire households and social networks to **vigilante threats**.

4

## VIII. Educational and Social Barriers

SORA closes off normal pathways of **reintegration** while contaminating educational opportunities for families:

**University and Library Exclusions:** Registrants are **barred from campuses**, **libraries**, and **community centers**, eliminating opportunities for education and advancement.

**Children's Educational Disruption:** Children of registrants face **school transfers** when residency restrictions force family relocations, disrupting their **educational continuity** and social development.

**Children's Opportunities Destroyed:** Children of registrants are **excluded from extracurricular activities**, stigmatized at school, and **isolated from peers**.

**Community Isolation:** Spouses and family members live under **constant suspicion**, often losing friendships, employment, and community standing.

**Chilled Social Networks:** The vehicle reporting requirements discourage friends and extended family from maintaining **normal relationships**, as their property and activities may become subject to **state reporting**.

## IX. Healthcare and Social Services Barriers

The registry's reach extends into **essential services**:

**Medical Privacy Violations:** Healthcare providers may access registry information, leading to **discrimination in medical treatment** for entire families.

**Social Services Exclusion:** Families may be **denied access** to social programs, childcare assistance, and community support services due to registry status.

**Insurance Discrimination:** Property and vehicle insurance may be **denied or priced prohibitively** for family members due to registry association.

## X. Constitutional Relevance

These collateral harms are **constitutionally significant** for multiple reasons:

**Due Process:** Punishment is extended to **innocent third parties** without **notice**, **hearing**, or **individualized adjudication**. Vehicle owners, employers, and family members become subject to state surveillance and potential public exposure without any **procedural protections**.

**Equal Protection:** Families of registrants are treated as a **disfavored class**, suffering systemic exclusion from housing, education, employment opportunities, and **basic civic participation**.

**Fourth Amendment:** The extensive vehicle reporting requirements effectively subject innocent third parties to **warrantless searches and seizures** of their private information.

**First Amendment:** The **chilling effect on association rights** prevents normal social relationships and community participation.

**Eighth Amendment:** By inflicting punishment on entire households and social networks, SORA violates **evolving standards of decency** and denies **human dignity**.

**Substantive Due Process:** The arbitrary extension of punishment to uninvolved parties violates fundamental notions of **fairness and proportionality**.

The Constitution does not permit **inherited punishment**, **collective penalties**, or the **conscription of innocent parties** into punitive surveillance systems. Yet SORA achieves exactly these results, not through accident but by **deliberate design**.

# XI. Conclusion

**Collateral damage is not a byproduct of SORA; it is its defining feature.** By extending punishment to families, destabilizing communities, exposing innocent parties to violence, and conscripting third parties into state surveillance through vehicle reporting and other invasive requirements, SORA violates **fundamental constitutional protections**. These spillover harms demonstrate that SORA is not merely unconstitutional as applied to registrants—it is an **unconstitutional regime in its very structure**, incompatible with the principles of **limited government**, **proportional punishment**, **individual accountability**, and the **protection of innocent persons** from state-imposed stigma and surveillance.

The system's **vehicle reporting requirements** exemplify this constitutional overreach, transforming every car owner, employer, and friend into an **unwilling participant** in the state's punitive apparatus. This expansion of punishment beyond the convicted individual represents a **fundamental departure from American principles** of justice and constitutional governance.

6

SEP 1 9 2025

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK

SEP 1 9 2025

RECEIVED

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF NEW YORK

**John Doe,**
 Plaintiff,

v.

**Letitia James, in her official capacity as Attorney General of New York, et al.,**
 Defendants.

Case No. **1:25-cv-1250 (BKS/ML)**

## EXHIBIT L

*When Supervision Meets Digital Privacy: The Limit Of Warrantless Phone Searches by New York State Parole Officers*

Submitted by Plaintiff, pro se

**Exhibit content continues on reverse.**

*A comprehensive analysis of the evolving legal landscape governing electronic device searches in parole supervision, with special considerations for sex offender registrants under SORA*

# Introduction

In an era where smartphones contain the digital equivalent of entire filing cabinets of personal information, a critical question has emerged at the intersection of criminal justice supervision and constitutional privacy rights: **Can New York State parole officers seize and forensically analyze a parolee's phone without obtaining a court order?**

This question has gained particular urgency for individuals subject to both parole supervision and **New York's Sex Offender Registration Act (SORA)**, who face enhanced monitoring requirements that may include **internet and computer restrictions**. As parole officers increasingly encounter digital devices during routine supervision activities, courts grapple with applying traditional **Fourth Amendment frameworks** to revolutionary technology while navigating the complex web of **SORA compliance obligations**.

The answer, as this analysis demonstrates, depends on drawing a **crucial distinction between the initial seizure of a device and its subsequent forensic examination**, while considering the heightened scrutiny that applies to **sex offense parolees** under both parole conditions and SORA requirements.

# The Constitutional Framework: Diminished but Not Extinguished Rights

## The Federal Foundation

The United States Supreme Court established in *Samson v. California* that parolees possess **"fewer expectations of privacy than probationers,"** acknowledging that individuals under parole supervision have voluntarily accepted **diminished constitutional protections** as a condition of their conditional release. However, this reduction in privacy expectations does not constitute a **wholesale abandonment of Fourth Amendment protections**.

## New York's Enhanced Protections

New York State has adopted a **more protective approach** through the landmark decision in *People v. Huntley*, which requires that any search of a parolee must be **"rationally and reasonably related"** to legitimate parole supervision duties. This standard, while permissive compared to the **probable cause requirement** for ordinary citizens, nevertheless establishes **meaningful boundaries** on parole officers' search authority.

2

The *Huntley* **standard** serves as a **constitutional floor**, preventing arbitrary **"fishing expeditions"** while preserving officers' ability to conduct searches genuinely connected to supervision objectives such as ensuring compliance with parole conditions, protecting public safety, or addressing specific supervisory concerns. For **SORA-registered individuals**, this analysis becomes more complex as officers must balance traditional parole supervision with **specific internet and computer monitoring obligations** imposed by sex offender registration requirements.

## Recent Case Law: Drawing the Boundaries

### *People v. Lively*: Establishing Limits

The 2024 decision in *People v. Lively* exemplifies how New York courts are applying the *Huntley* standard with **increasing rigor**. The court found a search of the defendant's pocket unconstitutional because it **lacked any substantial relationship** to legitimate parole supervision duties. This decision signals that courts will **scrutinize the nexus** between the search and supervisory purposes, rejecting searches that appear **pretextual or investigatory in nature**.

### *People v. Thomas*: Supervisory Justification

Conversely, *People v. Thomas* demonstrates when **warrantless searches of parolees withstand constitutional scrutiny**. The court upheld a vehicle search where the parolee was driving outside his approved county and exhibiting suspicious conduct. The search was **directly tied to verifying compliance** with geographical restrictions and investigating potential parole violations.

These cases establish a **clear pattern**: courts will uphold searches with **genuine supervisory justifications** while rejecting those that appear designed primarily to **gather evidence for new criminal prosecutions**.

## The SORA Complication: Enhanced Supervision and Digital Restrictions

### SORA's Digital Monitoring Framework

**New York's Sex Offender Registration Act** creates additional layers of supervision that directly impact digital device searches. **SORA-registered individuals** often face **specific conditions** regarding internet access, computer use, and digital communications that go beyond standard parole requirements. These conditions typically include:

- **Prohibited access to social media platforms** frequented by minors
- **Restrictions on internet-enabled gaming** and chat applications

- **Mandatory disclosure of all internet identifiers** and email addresses
- **Prohibition on accessing pornography** or sexually explicit material
- **Restrictions on communication with minors** through any electronic means

## The "Rational Relation" Test Under SORA

For **SORA registrants on parole**, the *Huntley* **"rationally and reasonably related"** standard takes on enhanced significance. Parole officers may argue that digital device searches are more easily justified when supervising sex offenders due to:

**Specific SORA Compliance**: Verifying compliance with **internet restrictions** and **prohibited communications** creates a clearer supervisory nexus than general parole monitoring.

**Public Safety Concerns**: The **risk assessment framework** underlying SORA may support more intrusive supervision methods, including digital monitoring.

**Condition-Specific Monitoring**: Unlike general parolees, **SORA registrants** have explicitly agreed to **computer and internet restrictions** as part of their supervision terms.

# The Digital Revolution: *Riley v. California* and Its Implications for SORA Supervision

## The Transformative Nature of Digital Devices

The Supreme Court's decision in *Riley v. California* **fundamentally altered** the constitutional landscape surrounding searches of electronic devices. The Court recognized that modern smartphones are **qualitatively different** from traditional physical containers, noting that they contain **"the sum of an individual's private life"** and present privacy concerns **"of an entirely different magnitude"** than searches of physical objects.

*Riley* established that the **search incident to arrest exception**—a well-established Fourth Amendment doctrine—**does not extend** to the digital contents of cell phones without a warrant. This holding reflects the Court's recognition that **digital devices require heightened constitutional protection** due to their capacity to store vast amounts of highly personal information.

## Applying *Riley* to Parole Supervision

While *Riley* addressed searches incident to arrest, its reasoning extends logically to **parole supervision contexts**, including **SORA compliance monitoring**. The Court's emphasis on the **unique nature of digital information** and the privacy interests it implicates suggests that even individuals with **diminished privacy expectations** under parole supervision and **SORA registration** retain **meaningful protections** regarding their electronic devices.

4

The *Riley* framework becomes particularly relevant for **SORA registrants** because their digital restrictions create a **heightened government interest** in monitoring electronic devices, potentially creating tension with the Supreme Court's recognition of **enhanced digital privacy rights**.

# The Critical Distinction: Seizure versus Forensic Analysis

## Seizure: The Initial Taking

A parole officer's **initial seizure** of a smartphone may be constitutionally permissible under the *Huntley* standard if it bears a **rational relationship to supervision duties**. For **SORA registrants**, this analysis may be more permissive due to **specific digital compliance obligations**. Examples of justified seizures might include:

- **Preventing destruction of evidence** during a **SORA compliance check**
- **Temporarily securing a device** while investigating **prohibited internet activity**
- **Immediate seizure** when officers observe **apparent violations** of social media restrictions
- **Emergency seizure** during investigations of **unauthorized contact with minors**

The key inquiry remains whether the seizure serves a **legitimate supervisory purpose** related to **SORA compliance** rather than a **general investigative goal**. Courts will examine whether the officer's actions were **reasonably tailored** to address specific **SORA violations** rather than general criminal activity.

## Forensic Analysis: Crossing the Constitutional Line

**Forensic analysis** of a seized phone's contents presents an **entirely different constitutional question**, even for **SORA registrants**. While such analysis might seem more justified for sex offenders due to **specific digital restrictions**, it typically involves using specialized software to extract deleted files, recover internet browsing history, analyze metadata, and access encrypted communications—going **far beyond** what routine **SORA compliance monitoring** would require.

This **comprehensive examination** of digital contents more closely resembles a **criminal investigation** than **SORA supervision**. Even considering the **enhanced government interest** in monitoring sex offenders' digital activities, the **invasive nature** of forensic analysis, combined with the **heightened privacy interests** recognized in *Riley*, strongly suggests that such searches require either a **warrant based on probable cause** or the registrant's **voluntary, knowing consent**.

5

## Special Considerations for SORA Digital Forensics

The intersection of **SORA requirements** and **digital forensic analysis** creates unique legal considerations:

**Scope Limitation**: Even if **SORA compliance** justifies some digital monitoring, forensic analysis must be **limited to SORA-related violations** rather than general criminal investigation.

**Proportionality Analysis**: Courts must balance the **specific supervisory need** to monitor SORA compliance against the **comprehensive intrusion** of forensic analysis.

**Consent Complications**: The **coercive nature** of SORA supervision may make **voluntary consent** to forensic analysis more difficult to establish than in general parole cases.

# Regulatory Framework and Its Limitations

## Current Parole Conditions

Standard New York State parole conditions authorize officers to **"search and inspect"** a parolee's **"person, residence, and property."** For **SORA registrants**, additional conditions typically include **specific digital restrictions** and **computer monitoring requirements**. However, the language of both standard parole conditions and **typical SORA conditions predates comprehensive digital forensic capabilities** and does not explicitly address the scope of permissible digital analysis.

The **ambiguity in existing regulations** becomes more pronounced for **SORA registrants** who face overlapping supervision requirements. While **SORA conditions** may explicitly restrict internet activities, they typically do not clearly authorize **comprehensive forensic analysis** of digital devices. This **regulatory uncertainty** undermines claims that **sex offender registrants** have clearly consented to **unlimited digital forensic examination** as a condition of supervision.

## Enhanced "Agent of Law Enforcement" Concerns for SORA Cases

The **"Agent of Law Enforcement"** problem becomes particularly acute in **SORA cases** where the line between **supervision and investigation** often blurs. **Sex offender parolees** are frequently subjects of ongoing law enforcement interest, creating risks that parole officers may conduct **digital searches** at the behest of criminal investigators rather than for genuine **SORA compliance purposes**.

Courts scrutinize whether parole officers are acting within their **SORA supervisory role** or functioning as **agents of criminal investigators**. **SORA registrants** may have stronger arguments that **forensic digital analysis** exceeds supervisory purposes when the analysis

appears designed to **develop new criminal cases** rather than monitor **specific SORA violations**.

# Legislative Developments and Future Trends

## The New York Electronic Communications Privacy Act

Pending legislation in the form of the **New York Electronic Communications Privacy Act (NYECPA)** would **codify warrant requirements** for searches of electronic devices and digital communications. While not yet enacted, the legislative movement reflects **growing recognition** that digital privacy requires **explicit statutory protection** beyond traditional Fourth Amendment frameworks.

The proposed legislation suggests that New York lawmakers view current legal protections as **insufficient** to address the unique privacy concerns raised by digital device searches, supporting the argument that **forensic analysis** of parolee devices should require **judicial authorization**.

## Federal Developments

**Federal probation and parole conditions** have evolved to **explicitly address electronic devices**, often requiring supervisees to submit to searches of computers, cell phones, and other digital devices. **Federal SORNA (Sex Offender Registration and Notification Act)** cases have generally been more permissive of **digital device monitoring** for sex offenders, but even these explicit conditions increasingly face **constitutional challenges**, particularly when applied to **comprehensive forensic analysis** rather than limited compliance monitoring.

# Practical Implications for Legal Practice

## Defensive Strategies

Defense attorneys representing parolees should consider multiple avenues for challenging warrantless phone searches:

**Challenge the Initial Seizure**: Even if the seizure appears justified by **SORA compliance concerns**, attorneys should examine whether it truly bears a **rational relationship** to **specific SORA violations** under *Huntley*. Scrutinize whether the officer was investigating **particular digital restrictions** or conducting a **general fishing expedition**.

**Distinguish Seizure from Analysis**: Even if the initial seizure was lawful for **SORA monitoring purposes**, argue that **forensic analysis exceeds the scope** of SORA supervision and requires a warrant. Emphasize that **comprehensive digital forensic techniques** go beyond what is necessary for **routine SORA compliance checking**.

**Invoke *Riley* Protections**: Stress the **unique privacy interests** in digital devices recognized by the Supreme Court and argue that these protections apply even to **SORA registrants** under enhanced supervision.

**Challenge SORA-Specific Scope**: Argue that even if **SORA status** justifies some digital monitoring, **forensic analysis** must be **limited to SORA-related compliance issues** and cannot extend to general criminal investigation.

**Highlight Consent Issues**: Challenge the **voluntariness of any purported consent** to forensic analysis, particularly given the **highly coercive nature** of **SORA supervision** and the lack of clear warnings about the comprehensive scope of digital forensic analysis.

**Argue Proportionality**: Contend that **comprehensive forensic analysis** is **disproportionate** to the supervisory need for **SORA compliance monitoring**, especially when less intrusive methods could achieve the same supervisory goals.

## Prosecutorial Considerations

Prosecutors should recognize the **constitutional vulnerability** of evidence obtained through **warrantless forensic analysis** of parolee devices, even in **SORA cases**. While **sex offender status** may create **enhanced supervisory interests**, it does not eliminate **Fourth Amendment protections**. The prudent approach involves **obtaining search warrants** for digital forensic analysis, even when dealing with **SORA registrants**, to ensure the **admissibility of any evidence** discovered.

**SORA-Specific Prosecutorial Considerations**:

- **Limit analysis scope** to **SORA compliance issues** unless a separate warrant authorizes broader investigation
- **Document the supervisory nexus** between any digital search and specific **SORA violation concerns**
- **Avoid using SORA status** as a general justification for **comprehensive digital investigations**

# Comparative Analysis: State and Federal Standards

| Searching Authority | Target | Legal Standard | Warrant Required? | Key Considerations |
|---|---|---|---|---|
| Police Officer | Any Person | **Probable Cause** | Yes (with exceptions) | Traditional Fourth Amendment analysis |
| NYS Parole Officer | Physical Search | **Rational Relation** (*Huntley*) | No | Must connect to supervision duties |
| NYS Parole Officer | Digital Forensics | **Rational Relation +** *Riley* **Protection** | **Likely Yes** | Analysis exceeds supervisory scope |
| NYS Parole Officer | **SORA Registrant Digital** | **Rational Relation + SORA Compliance +** *Riley* | **Likely Yes** | Enhanced interest vs. enhanced protection |
| Federal Probation | Electronic Devices | **Reasonable Suspicion** | Sometimes | Explicit device conditions in federal system |
| Federal SORNA | **Sex Offender Digital** | **Reasonable Suspicion + SORNA Compliance** | **Varies** | More permissive federal framework |

# Recommendations and Best Practices

## For Parole Officers

- Limit initial device seizures to circumstances with **clear SORA compliance justifications**
- Document the **specific SORA-related reasons** for any device seizure
- Avoid comprehensive forensic analysis without either a warrant or **explicit, voluntary consent**
- **Distinguish between SORA supervision and criminal investigation** in all digital search activities
- Coordinate with legal counsel before conducting digital searches that go beyond **routine SORA compliance monitoring**

## For Legal Practitioners

- Carefully examine whether digital searches are truly **SORA-compliance related** or **general criminal investigations**

9

- Challenge both the initial seizure and any subsequent forensic analysis under **separate legal theories**
- Develop expertise in **digital forensic techniques** to effectively cross-examine government witnesses
- Consider suppression motions that distinguish between **limited SORA compliance inspections** and **comprehensive forensic analysis**
- **Argue proportionality** between the **invasiveness of the search** and the **specific SORA supervisory need**

# Conclusion: Balancing Supervision, SORA Compliance, and Privacy in the Digital Age

The intersection of parole supervision, **SORA requirements**, and digital privacy rights represents one of the most **challenging areas in contemporary criminal law**. While **SORA registrants** have accepted **additional limitations on their privacy rights** and **specific digital restrictions** as conditions of supervision, these limitations do not extend to **wholesale abandonment of constitutional protections**, particularly regarding the **highly sensitive information** contained in modern electronic devices.

New York courts appear to be moving toward a framework that permits **initial seizure of devices** when justified by legitimate **SORA compliance concerns** but requires **judicial authorization for comprehensive forensic analysis**. This approach strikes a **reasonable balance** between the state's enhanced interest in monitoring sex offenders' digital activities and the individual's retained privacy interests in their digital lives.

The **SORA context** adds complexity to this analysis by creating **specific government interests** in digital monitoring while simultaneously raising concerns about **pretextual use** of sex offender status to justify **otherwise impermissible searches**. As courts continue to refine their approach to these issues, practitioners must carefully distinguish between **legitimate SORA compliance monitoring** and **general criminal investigation disguised as supervision**.

As technology continues to evolve and courts refine their approach to digital privacy rights, practitioners must remain vigilant in protecting both the **supervisory needs** of the criminal justice system and the **constitutional rights** of individuals under **SORA supervision**. The emerging legal framework suggests that while **sex offender registrants** may face **enhanced digital monitoring**, they retain **meaningful protections** against unreasonable searches of their digital devices—protections that require careful analysis of both the **scope of the intrusion** and its relationship to **legitimate SORA compliance purposes**.

The future of this area of law will likely depend on legislative action, continued judicial refinement of existing doctrines, and the ongoing balance between **public safety concerns**, **SORA compliance requirements**, and **individual privacy rights** in our increasingly digital society. Legal practitioners on all sides must stay abreast of these developments to effectively

advocate for their clients and ensure that constitutional principles adapt appropriately to the unique challenges posed by **digital supervision of sex offenders**.

## Internet Bans as the Ultimate Overreach

The problem extends beyond cell phone seizures. New York parole officers, particularly in SORA cases, often impose sweeping restrictions on internet use—sometimes prohibiting access altogether. While supervision may justify narrowly tailored limits, such **blanket prohibitions are unconstitutional**.

As the Supreme Court recognized in *Packingham v. North Carolina*, the internet is the "modern public square." Denying access to it altogether silences speech, isolates individuals from family, employment, education, and worship, and transforms parole from supervision into punishment.

Thus, whether through warrantless forensic phone searches or blanket internet bans, New York's approach collapses into the same constitutional impossibility: **an unlimited surveillance regime that exceeds Huntley's supervisory purpose, defies Riley's digital privacy protections, and violates Packingham's free speech guarantees.**

The authority of a parole officer to conduct a **warrantless search** is strictly tied to the officer's **supervisory role**. Under *People v. Huntley*, a parole search must be **"rationally and reasonably related"** to the officer's duties in monitoring compliance with parole conditions. This supervisory authority does not extend to acting as an **agent of law enforcement**.

When a parole officer **seizes a parolee's cell phone** and then **hands it over to police for forensic analysis**, the **constitutional framework changes entirely**. At that point, the parole officer is no longer exercising **supervisory authority** but is functioning as an **investigative proxy for law enforcement**. Courts have repeatedly recognized that when the **primary purpose** of a parole search is to **gather evidence for new criminal charges**, the search is governed not by the relaxed **Huntley standard** but by the **full Fourth Amendment warrant requirement**.

This distinction is especially critical in the **digital context**. As the Supreme Court emphasized in *Riley v. California*, cell phones are not mere **containers of property** but **"microcomputers" containing "the sum of an individual's private life."** A **forensic extraction** of such data is an inherently **investigatory act** that requires **judicial authorization**.

Thus, if a parole officer **seizes a phone** only to **transfer it to law enforcement for forensic analysis**, the action **exceeds the permissible scope of parole supervision** and becomes **constitutionally defective**. Without a valid **search warrant** or explicit, **voluntary consent**, such a hand-off **violates the Fourth Amendment**.

**Huntley allows only narrow parole checks, Riley requires a warrant for phone searches, and Packingham forbids total internet bans.**